NORTH CAROLINA

GUILFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 23 CVS 5255

**FILED**

2023 MAY 19 P 3: 01

GUILFORD CO., C.S.C.

BY _____

BRITTNEY HOLMES; ELIZABETH YOUNG;
DONNA LO; DANIEL LO; RODNEY MORROW;
SUSAN MORROW; TIM JESSUP; CARLA
MCNABB; BRITTANY WRENN; EMILY
LEONARD; ANTHONY LEONARD;
MATTHEW DAVIS; DIANE STEVIO; SHERRIE
MCWHORTER; ROBERT HARVILLE;  FAYE
HARVILLE; GAIL SIMMONS; DANNY
PHILLIP SIMMONS; WILLIAM SMITH;
SHANNON SMITH; CURTIS MAHAFFEY; AND
LISA MAHAFFEY;

     Plaintiffs,

Vs

3M COMPANY (f/k/a Minnesota Mining and
Manufacturing, Co.; ANGUS FIRE;
AGC CHEMICAL AMERICAS, INC.; AGC INC.
F/K/A ASAHI GLASS CO.;  ARCHROMA
MANAGEMENT LLC; ARCHROMA US, INC.;
ARKEMA INC.; BASF CORPORATION;
BUCKEYE FIRE PROTECTION CO.; CARRIER
GLOBAL CORPORATION; CHEMDESIGN
PRODUCTS, INC.; CHEMGUARD, INC.;
CHEMICALS INC.; CHUBB FIRE, LTD.;
CLARIANT CORP.; CORTEVA, INC.;
DEEPWATER CHEMICALS, INC.; DOE
DEFENDANTS, JOHN 1-49; DUPONT DE
NEMOURS, INC.; DYNAX CORP.; E.I. DU
PONT DE NEMOURS & COMPANY;
NATIONAL FOAM, INC.; NATION FORD
CHEMICAL COMPANY; RAYTHEON
TECHNOLOGIES CORPORATION F/K/A
UNITED TECHNOLOGIES CORPORATION;
THE ANSUL COMPANY; THE CHEMOURS
COMPANY; THE CHEMOURS COMPANY FC,
LLC; TYCO FIRE PRODUCTS, LP; AND UTC
FIRE & SECURITY AMERICAS
CORPORATION,

    Defendants.

**COMPLAINT**

Plaintiffs, by and through undersigned counsel, bring this action against Defendants 3M Company, E. I. DuPont De Nemours and Company, The Chemours Company, The Chemours Company, FC, LLC, Chemguard, Inc., Tyco Fire Products, LP, Ansul Company, National Foam Inc., Angus Fire Armour Corporation, Buckeye Fire Equipment Company, AGC Chemical Americas, Inc., AGC Inc. f/k/a Asahi Glass Co., Archroma Management LLC, Archroma US, Inc. Arkema Inc., BASF Corporation, Carrier Global Corporation, ChemDesign Products, Inc., Chemicals Inc., Chubb Fire, LTD., Clariant Corp., Corteva, Inc., Deepwater Chemicals, Inc., DuPont De Nemours, Inc., Dynax Corp., Nation Ford Chemical Company, Raytheon Technologies Corporation f/k/a United Technologies Corporation, UTC Fire & Security Americas Corporation, and John Doe Defendants 1-49 (collectively, "Defendants"). Plaintiffs, based on information, belief, and investigation of Counsel, allege as follows:

## I.    SUMMARY OF THE CASE

1.    Plaintiffs are individuals who own real property and reside close to the Piedmont Triad International Airport in Greensboro, North Carolina. Private drinking water wells on these properties are contaminated with per- and polyfluoroalkyl substances ("PFAS") including, but not limited to, perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic acid ("PFOS"). Plaintiffs bring this action against Defendants, who manufactured aqueous film-forming foam ("AFFF"), a fire-fighting foam containing PFAS that was used at the airport. Plaintiffs contend that the use of AFFF caused the contamination of their properties and their personal injuries.

2.    PFOA and PFOS both are known to be toxic, persistent in the environment, not biodegrade, move easily through soil and groundwater, and pose a significant risk to human health and safety. Both are animal carcinogens and likely human carcinogens. Indeed, the United States Environmental Protection Agency ("EPA") has stated that "human epidemiology data report associations between PFOA exposure and high cholesterol, increased liver enzymes, decreased

vaccination response, thyroid disorders, pregnancy- induced hypertension and preeclampsia, and cancer (testicular and kidney)" and that "there is suggestive evidence of carcinogenic potential for PFOS."[1]

3.    Upon information and belief, at various times throughout the 1960s to present date, Defendants designed, manufactured, marketed, distributed, and/or sold PFOA, PFOS, the chemical precursors of PFOA and/or PFOS, and/or AFFF containing PFOA, PFOS, and/or their chemical precursors (collectively, "Fluorosurfactant Products") throughout the United States, including in North Carolina.

4.    At all relevant times, upon information and belief, Defendants knew, or reasonably should have known, about the inherent risks and dangers involved in the use of PFAS compounds in their products—including that both PFOA and PFOS are mobile in water, not easily biodegradable, highly persistent in the environment, and present significant and unreasonable risks to both human health and the environment. Nevertheless, Defendants made a conscious choice to manufacture, market, sale, and otherwise place Fluorosurfactant Products into the stream of commerce for decades, all while knowing PFAS compounds would be inevitably released into the environment—for instance, in the use of AFFF for fire protection, training, and response activities, even when used in the manners directed and intended by the manufacturer—and concealing their knowledge of the risks involved.

---

[1] *See* U.S. Envtl. Protection Agency ("EPA"), Office of Water Health and Ecological Criteria Division, "Health Effects Support Document for Perfluorooctanoic Acid (PFOA)," EPA Document Number: 822-R-16-003, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfoa_hesd_final-plain.pdf (last accessed 1/24/2023); *see also* EPA, Office of Water Health and Ecological Criteria Division, "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)," EPA Document Number: 822-R-16- 002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed 1/24/2023).

5. At all relevant times, Plaintiffs did not know, nor should they have reasonably known, of the ongoing contamination of their properties and water wells through the use of Defendants' Fluorosurfactant Products, as Defendants did not disclose the toxic nature and harmful effects of their Fluorosurfactant Products. Plaintiffs' wells, water sources and supply, water supply and delivery system infrastructure, including any treatment systems, are collectively referred to as "Plaintiffs' Properties" in this Complaint.

6. Plaintiffs file this lawsuit to recover compensatory and all other damages, including but not limited to the costs of restoring and remediating contamination from their real properties and drinking water wells, past and future medical costs, non-economic damages, loss of earnings and future earnings, and household expenses, among others.

## II. PARTIES

### A. PLAINTIFFS

7. Plaintiff Brittney Holmes owns a home at 5921 Firewood Trail, Greensboro, North Carolina. A private water well on the property supplies water to the residence.

8. Plaintiff Elizabeth Young owns a home at 5923 Firewood Trail, Greensboro, North Carolina. A private water well on the property supplies water to the residence.

9. Plaintiffs Daniel and Donna Lo own a home at 2206 Brigham Road, Greensboro, North Carolina. A private water well on the property supplies water to the residence.

10. Plaintiff Rodney and Susan Morrow own a home at 5925 Firewood Trail, Greensboro, North Carolina. A private water well on the property supplies water to the residence.

11. Plaintiff Tim Jessup owns a home at 3616 Lewiston Road, Greensboro, North Carolina. A private water well on the property supplies water to the residence.

12. Plaintiff Carla McNabb lives at 3616 Lewiston Road, Greensboro, North Carolina. Ms. McNabb's daughter, Plaintiff Brittany Wrenn, also lives at 3616 Lewiston Road, Greensboro,

North Carolina. Both have consumed, bathed in, and otherwise used water from the well on the property.

13.    Plaintiffs Emily and Anthony Leonard own a home at 4942 Hackamore Road, Greensboro, North Carolina. A private water well on the property supplies water to the residence.

14.    Plaintiffs Diane Stevio and Sherrie McWhorter own a home at 4930 Hackamore Road, Greensboro, North Carolina. A private water well on the property supplies water to the residence.

15.    Plaintiff Matthew Davis owns a home at 1910 Norwich Drive, Greensboro, North Carolina. A private water well on the property supplies water to the residence.

16.    Plaintiffs Robert and Faye Harville own a home at 4818 Fox Chase Road, Greensboro, North Carolina. A private water well on the property supplies water to the residence.

17.    Plaintiffs Danny Phillip and Gail Simmons own a home at 5919 Firewood Trail, Greensboro, North Carolina 27410. A private water well on the property supplies water to the residence.

18.    Plaintiffs William & Shannon Smith own a home at 4821 Fox Chase Road, Greensboro, North Carolina 27410. A private water well on the property supplies water to the residence.

19.    Plaintiffs Curtis Mahaffey and Lisa Mahaffey own homes located at 1901A & 1901B Fleming Road, Greensboro, North Carolina. A private water well on the property supplies water to the residence.

20.    Plaintiffs' Properties are located within a three-mile radius of the Piedmont Triad International Airport. Upon information and belief, Defendants' Fluorosurfactant Products were used for fire-training and fire-fighting activities at the airport.

21. Each Plaintiff has a property interest in its residential property, its water well and associated piping, and in the water it appropriates for use.

## B. DEFENDANTS

22. Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, and/or sold the Fluorosurfactant Products that have contaminated and continue to contaminate Plaintiffs' Properties, causing irreparable harm.

23. **3M:** Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFOA and/or PFOS used to fight fires at numerous military bases, airports, and other locations throughout the country.

24. 3M is the only company that manufactured and/or sold AFFF containing PFOS.

25. **AGC:** Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

26. **AGC AMERICA:** Defendant AGC Chemical Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd.

27. **ANGUS:** Defendant Angus Fire maintains corporate headquarters in Bentham, United Kingdom. Angus Fire manufactured, marketed and sold AFFF products that contained PFOA.

28. **ANSUL:** Defendant Ansul Company is a corporation organized and existing under the laws of the State of Wisconsin. This Defendant manufactured, marketed, and sold AFFF products that contained PFOA.

29. **ARCHROMA US:** Defendant Archroma U.S., Inc. ("Archroma US") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorosurfactant Products for use in AFFF.

30. **ARKEMA:** Defendant Arkema, Inc. is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema, Inc. is an operating subsidiary of Arkema France, S.A.

31. **BASF:** Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals.

32. **BUCKEYE:** Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. This Defendant manufactured and sold AFFF that contained PFOA.

33. **CARRIER:** Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

34. **CHEM INC.:** Defendant Chemicals Incorporated ("Chem Inc.") is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521.

35.    **CHEMDESIGN:** Defendant Chemdesign Products, Inc. ("ChemDesign") is a Texas corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143.

36.    **CHEMGUARD:** Defendant Chemguard, Inc. ("Chemguard") is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. This Defendant manufactured and sold AFFF that contained PFOA.

37.    **CHEMOURS:** Defendant The Chemours Company ("Chemours") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.

38.    In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of PFAS compounds and products that contain PFAS compounds.

39.    **CHEMOURS FC:** Defendant The Chemours Company FC LLC ("Chemours FC"), successor in interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company that conducts business throughout the United States. Its principal place of business is 1007 Market Street Wilmington, Delaware, 19899.

40.    **CHUBB:** Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is registered in the United Kingdom with a registered number of 134210. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or

divisions, including but not limited to Chubb Fire & Security Ltd., Chubb Security, P.L.C., Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Chubb is part of UTC Climate, Controls & Security, a unit of United Technologies Corporation.

41.     **CLARIANT:** Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205.

42.     **CORTEVA:** Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

43.     **DEEPWATER:** Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801.

44.     **DUPONT:** Defendant E. I. Du Pont De Nemours and Company ("DuPont") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

45.     **DUPONT DE NEMOURS:** Defendant DuPont De Nemours, Inc. (f/k/a DowDuPont, Inc.) is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805. DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont.

46.     Upon information and belief, Corteva was originally formed in February 2018 as a wholly-owned subsidiary of DowDuPont, Inc. On June 1, 2019, DowDuPont, Inc. separated its agriculture business through the spin-off of Corteva. In doing so, DowDuPont, Inc. distributed all issued and outstanding shares of Corteva common stock to DowDuPont, Inc. stockholders by way of a pro-rata dividend. Upon information and belief, following that distribution, Corteva became the direct parent of DuPont, and holds certain DowDuPont, Inc. assets and liabilities.

47. Following the June 1, 2019 spin-off of Corteva and of another entity, Dow, Inc., DowDuPont, Inc. changed its name to DuPont De Nemours, Inc. ("New DuPont"). Upon information and belief, New DuPont retained assets in the specialty products business lines, as well as the balance of the financial assets and liabilities of DuPont not assumed by Corteva.

48. **DYNAX:** Defendant Dynax Corporation ("Dynax") is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF.

49. **NATIONAL FOAM:** Defendant National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam manufactures the Angus Fire brand of products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). This Defendant manufactured and sold AFFF that contained PFOA.

50. **NATION FORD:** Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715.

51. **RAYTHEON TECHNOLOGIES CORP.:** Defendant Raytheon Technologies Corporation (f/k/a United Technologies Corporation) ("Raytheon Tech f/k/a United Tech") is a Delaware corporation with its principal place of business at 10 Farm Springs Road, Farmington, Connecticut 06032.

52. **TYCO:** Defendant Tyco Fire Products L.P. ("Tyco") is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446.

53.     Tyco is an indirect subsidiary that is wholly owned by Johnson Controls International P.L.C., an Irish public limited company listed on the New York Stock Exchange

54.     Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul") (hereinafter, Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco"). At all times relevant, Tyco manufactured, marketed, promoted, distributed, and/or sold fire suppression products, including AFFF that contained fluorocarbon surfactants containing PFAS.

55.     **UTC:** Defendant UTC Fire & Security Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.) ("UTC") is a North Carolina corporation with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092. UTC was a subsidiary of United Technologies Corporation.

56.     Upon information and belief, Defendant John Does 1-49 were manufacturers and/or sellers of AFFF products. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time the Plaintiffs will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

57.     All of the foregoing Defendants, upon information and belief, have previously conducted and/or currently conduct their business throughout the United States. Moreover, some of the foregoing Defendants, if not all, have conducted and/or are currently conducting business in the state of North Carolina.

58.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

59.     The term "Defendants," without naming any specific one, refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or

representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

### III.    JURISDICTION & VENUE

60.    This Court has jurisdiction pursuant to N.C.G.S. § 7A-243 because the amount in controversy exceeds twenty-five thousand dollars ($25,000,00).

61.    This Court has jurisdiction over Defendants because, based on information and belief, each is a corporation or other business that has sufficient minimum contacts in North Carolina, or otherwise intentionally avails itself of the North Carolina market either through the distribution or sale of products containing PFAS in the State of North Carolina or by having a manufacturing, distribution or other facility located in North Carolina so as to render the exercise of jurisdiction over it by the North Carolina courts consistent with traditional notions of fair play and substantial justice.

62.    Venue is appropriate in this county pursuant to N.C.G.S. §§ 1-76 et seq. as facts giving rise to the Plaintiffs' causes of action arose in Guilford County, and the plaintiffs are situated in and reside in this County.

### IV.    FACTUAL ALLEGATIONS
### COMMON TO ALL PLAINTIFFS AND CLASS MEMBERS

A.    THE PFAS CONTAMINANTS AT ISSUE: PFOA AND PFOS

63.    Both PFOA and PFOS fall within a class of chemical compounds known as perfluoroalkyl acids ("PFAAs"). PFAAs are then part of a larger chemical family recognized as per- and polyfluoroalkyl substances ("PFAS"). PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, meanwhile the last carbon atom is

attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature.

64. PFAAs are sometimes described as long-chain and short-chain compounds, depending on the number of carbon atoms contained in the carbon chain. PFOA and PFOS are considered long-chain PFAAs because they each have eight carbon atoms in their chains.

65. PFOA and PFOS are stable, man-made chemicals. They are highly water soluble, persistent in the environment and resistant to biologic, environmental, or photochemical degradation. Because these compounds are water soluble and do not readily adsorb to sediments or soil, they tend to stay in the water column and can be transported long distances.

66. Both PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in water, soil and air as well as in human food supplies, breast milk, umbilical cord blood, and human blood serum.[2]

67. Moreover, PFOA and PFOS are persistent in the human body and resistant to metabolic degradation. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[3]

---

[2] *See* Agency for Toxic Substances and Disease Registry, "Per- and Polyfluoroalkyl Substances and Your Health," available at https://www.atsdr.cdc.gov/pfas/health-effects/index.html (last accessed 11/22/2022).

[3] *See* U.S. Envtl. Protection Agency ("EPA"), Office of Water Health and Ecological Criteria Division, "Health Effects Support Document for Perfluorooctanoic Acid (PFOA)," EPA Document Number: 822-R-16-003, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfoa_hesd_final-plain.pdf (last accessed 1/24/2023); *see also* EPA, Office of Water Health and Ecological Criteria Division,
"Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)," EPA Document Number: 822-R-16- 002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed 1/24/2023).

68.    Notably, from the time these two compounds were first produced, information has since emerged showing negative health effects caused by exposure to PFOA and PFOS. According to the EPA, studies indicate that exposure of PFOA and PFOS over certain levels may result in a number of adverse impacts to human health. [4] [5]

69.    Additionally, the EPA has noted that "drinking water can be an additional source [of PFOA/PFOS in the body] in the small percentage of communities where these chemicals have contaminated water supplies." In communities with contaminated water supplies, "such contamination is typically localized and associated with a specific facility, for example [...] an airfield at which [PFOA/PFOS] were used for firefighting."[6]

70.    In June 2022, after evaluating over 400 studies published since 2016 and applying human health risk assessment approaches, tools, and models, EPA concluded that the new data indicates that the levels of PFOA and/or PFOS exposure at which negative outcomes could occur are much lower than previously understood when the agency issued its 2016 HAs for PFOA and PFOS (70 parts per trillion or ppt).  EPA announced new Interim Updates Health Advisory levels for PFOA of 0.004 ppt and 0.02 ppt for PFOS.[7]

---

[4] *See* EPA, "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/sdwa/drinking-water-health-advisories-pfoa-and-pfos (last accessed 11/22/2022).

[5] *See* EPA, "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)," Document Number: 822 R-16-002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed 11/22/2022).

[6] *See* EPA, "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/sdwa/drinking-water-health-advisories-pfoa-and-pfos (last accessed 11/22/2022).

[7] EPA, "Technical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX chemicals, and PFBS)," EPA Document Number 822-F-22-002, available at https://www.epa.gov/system/files/documents/2022-06/technical-factsheet-four-PFAS.pdf (last accessed January 24, 2023).

**B.     AQUEOUS FILM-FORMING FOAM (AFFF)**

71.     Aqueous Film-Forming Foam ("AFFF") is a water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports, among other places.

72.     Generally, AFFF is used to extinguish fires, particularly fires that involve petroleum or other flammable liquids. AFFF is typically sprayed directly onto a fire, where it then works by coating the ignited fuel source, preventing its contact with oxygen, and suppressing combustion.

73.     The AFFF products made by Defendants during the relevant time period contained either or both PFOA and PFOS. AFFF produced, marketed, and/or sold by 3M was the only AFFF produced from fluorochemicals manufactured through electrochemical fluorination ("ECF"), a process that generates PFOS. PFHxS is also produced during this process. All other Defendants used telomerization to produce AFFF. Fluorochemicals synthesized through telomerization degrade into PFOA, but not PFOS.

74. ·     When used as the Defendants intended and directed, the AFFF manufactured and/or sold by the Defendants released PFOA and/or PFOS into the environment.

75.     ·Once PFOA and PFOS are free in the environment, they do not hydrolyze, photolyze, or biodegrade under typical environmental conditions, and they are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, air, and groundwater.

76.     Notably, AFFF can be made without PFOA and PFOS. As such, fluorine-free foams do not release PFOA and/or PFOS into the environment.

77.     Despite having knowledge of this fact—as well as having knowledge regarding the toxic nature of AFFF made with PFOA and/or PFOS—Defendants continued to manufacture, distribute and/or sell AFFF with PFOA and/or PFOS, which has ultimately led to the ongoing contamination and damages to Plaintiffs' Properties.

78.     Defendants' Fluorosurfactant Products have been used for their intended purposes in the process of fire protection, training, and response activities within Connecticut for many years. During these activities, Defendants' Fluorosurfactant Products were used as directed and intended by the manufacturer, which allowed PFOA and PFOS to migrate through the subsurface and into the groundwater, enter into Plaintiffs' Properties, thereby contaminating Plaintiffs' wells and causing extensive and ongoing damage, as well as s to Plaintiffs' Properties.

79.     Due to the chemicals' persistent nature, among other things, these chemicals have caused, and continue to cause, significant injury and damage to Plaintiffs and Plaintiffs' Properties.

C.     DEFENDANTS' KNOWLEDGE AND CONCEALMENT OF PFOA/PFOS HAZARDS

80.     On information and belief, by the 1970s, Defendants knew, or reasonably should have known, among other things, that: (1) PFOA and PFOS are toxic; and (2) when sprayed in the open environment per the instructions given by the manufacturer, PFOA and PFOS migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from property and drinking water supplies only at substantial expense.

81.     At all times pertinent herein, Defendants also knew or should have known that PFOA and PFOS present a risk to human health and could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

82.     For instance, in 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated that it could take a

person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[8]

83.    By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

84.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[9]

85.    Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned: "[W]e must view this present trend with serious concern. It is certainly possible that [...] exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[10]

86.    Notwithstanding their respective knowledge of the dangers involved with AFFF containing PFOA and/or PFOS, Defendants negligently and carelessly: (1) designed, manufactured, marketed, and/or sold AFFF containing PFOA and/or PFOS; (2) issued instructions on how AFFF should be used and disposed of (namely, by washing the foam into the soil and/or waste water disposal systems), thus improperly permitting PFOA and/or PFOS to contaminate soil and

---

[8] *See* Envtl. Working Group ("EWG"), "New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades (last accessed 1/24/2023) (in particular, please refer to the "Letter from 3M to Office of Pollution Prevention and Toxics," referenced in the article).

[9] *See id.* (in particular, please refer to the "C8 Blood Sampling Results, Births and Pregnancies" Memorandum referenced in the article).

[10] *See id.* (in particular, please refer to the "Organic Fluorine Levels" Memorandum referenced in the article).

groundwater; (3) failed to recall and/or warn users of AFFF, negligently designed products containing or degrading into PFOA and/or PFOS, of the dangers of soil and groundwater contamination as a result of the standard use and disposal of these products; and, (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of AFFF containing PFOA and/or PFOS, notwithstanding the fact that Defendants knew the identity of the purchasers of the AFFF containing PFOA and/or PFOS.

87.     As a direct result of Defendants' acts alleged in this Complaint, Plaintiffs' Properties have been contaminated, and will continue to be contaminated, with PFOA and PFOS. This has created an environmental and public health hazard until such contamination may be remediated. As a direct and proximate result, Plaintiffs must assess, evaluate, investigate, monitor, remove, clean up, correct, and remediate PFOA and PFOS contamination from their properties at significant expense, loss and damage to Plaintiffs.

88.     Defendants had a duty to evaluate and test such products adequately and thoroughly to determine their environmental fate and transport characteristics and potential human health and environmental impacts before they sold such products, but they breached this duty. Defendants moreover breached their duty to minimize the environmental harm caused by PFOA and PFOS. Moreover, Defendants failed to warn Plaintiffs of the known risks for environmental and health hazards arising from the usage of Defendants' Fluorosurfactant Products in their intended manner for its intended purpose.

## D.     OLD DUPONT'S FRAUDULENT PLANS TO SHIELD ITS ASSETS FROM PFAS LIABILITIES

89.     By 2013, Old DuPont faced mounting liabilities arising out of its long-running manufacture, use, marketing, distribution, and sale of PFOA and/or its chemical precursors

throughout the country. These liabilities included, among other things, clean-up costs, remediation obligations, tort damages, natural resources damages, and potential punitive damages.

90.     Upon information and belief, by 2013, in order to shield its assets from these liabilities and make itself a more appealing merger partner, Old DuPont began to consider and/or engage in a complex series of corporate restructurings and spin-offs.

91.     In or around 2014, Old DuPont formed The Chemours Company as a wholly-owned and operated subsidiary. Shortly thereafter, Old DuPont transferred its "Performance Chemicals" business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) to Chemours.

92.     At the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liabilities for damages and injuries arising from its manufacture and sale of its PFAS products, including PFOA and its chemical precursors.

93.     Upon information and belief, prior to the spinoff, Chemours was a wholly-owned subsidiary of Old DuPont and its four-member Board of Directors consisted of three Old DuPont employees and a former member of Old DuPont's Board of Directors. Then, effective immediately prior to the spinoff, the Chemours Board of Directors doubled in size, the three Old DuPont employees resigned, and seven new members were appointed to fill the vacancies. This new Chemours Board of Directors did not take part in negotiating the Separation Agreement.

94.     In or around July 1, 2015, Old DuPont completed the spin-off Chemours as a separate public entity and saddled Chemours with Old DuPont's massive PFAS liabilities.

95.     Although many of the details of the Separation Agreement remain largely hidden from the public, upon information and belief, as part of the Separation Agreement, Chemours accepted

broad assumption of Old DuPont's environmental liabilities arising out of its long-running manufacture, use, discharge, marketing, distribution, and sale of PFAS.

96.    Additionally, Chemours agreed to assume for itself and indemnify Old DuPont against all liabilities relating to or arising from the operation of the Performance Chemicals business at any time and regardless of which entity is named in any action or against whom such liabilities are asserted or determined.

97.    Further, Chemours agreed to assume for itself and indemnify Old DuPont from all environmental liabilities that arose prior to the spinoff if Old DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals business.

98.    Upon information and belief, the value of the assets Chemours transferred to Old DuPont was substantially more than the value of the assets it received from Old DuPont, and Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

99.    Old DuPont knew that Chemours was undercapitalized and unable to satisfy the massive liabilities that it assumed from Old DuPont. In addition to the assumption of such liabilities, Chemours was required to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

100.    In or around December 2015, Old DuPont entered into an agreement with Dow, Inc. ("Old Dow") pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created solely for the purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

101.    Following its creation, DowDuPont engaged in a number of realignments and divestitures, the details of which remain largely hidden from Plaintiffs and other creditors, intended to frustrate and/or hinder creditors with claims against Old DuPont. Upon information and belief, the

net effect of these transactions was the transfer, directly or indirectly, of a substantial portion of Old DuPont's assets to DowDuPont for far less than these assets were worth.

102.    By 2019, DowDuPont spun-off two new publicly traded companies, Corteva, Inc. and Dow, Inc. ("New Dow"). DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

103.    Upon information and belief, Corteva currently holds Old DuPont as a subsidiary.

104.    Upon information and belief, as part of the DowDuPont Separation Agreement, Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science, or Specialty Products Businesses, including the PFAS liabilities which are allocated on a pro rata basis between Corteva and New DuPont.

### E.    THE IMPACT OF PFOA AND PFOS ON PLAINTIFFS AND CLASS MEMBERS

105.    As discussed above, Plaintiffs own real properties and private drinking water wells affected by PFOA and PFOS contamination.

106.    Plaintiffs have been regularly exposed to PFOS and PFOA compounds.

107.    Defendants' PFOA & PFOS have caused elevated cholesterol levels in Plaintiff Matthew Davis.

108.    Defendants' PFOA & PFOS have caused elevated cholesterol levels in Plaintiff Brittany Wrenn.

109.    Defendants' PFOA & PFOS have caused thyroid disease, kidney disease, and elevated cholesterol levels in Plaintiff Carla McNabb.

110.    Defendants' PFOA & PFOS have caused thyroid disease in Plaintiff William Smith.

111.    The detection and/or presence of PFOA and PFOS, and the threat of further detection and/or presence of PFOA and PFOS, on Plaintiffs' Properties has resulted, and will continue to result, in significant injury and damage to Plaintiffs.

112. The invasion of Plaintiffs' Properties with PFOA and PFOS is continuous and recurring, as new contamination flows regularly and constantly into Plaintiffs' Properties each day—the result of which is a new harm to each Plaintiff and its property in each and every occurrence.

113. The injuries to Plaintiffs caused by Defendants' conduct constitute an unreasonable interference with, and damage to, the limited subterranean and surficial supplies of fresh drinking water on which Plaintiffs' wells depend.

114. A stigma attaches to Plaintiffs' properties due to PFOA & PFOS contamination in the area surrounding Plaintiffs' properties, causing a reduction of value of Plaintiffs' properties.

115. Plaintiffs' exposure to PFOA and PFOS has occurred, and continues to occur, on a daily basis. Exposure constitutes physical injury to each Plaintiff.

116. Through this action, Plaintiffs seek to recover damages (including but not limited to compensatory, punitive, and/or consequential damages) arising from both personal injury to Plaintiffs and the continuous and ongoing contamination of Plaintiffs' Properties by Defendants' Fluorosurfactant Products. Such damages moreover include, but are not limited to, the past and future costs of restoring and remediating contamination from their real properties and drinking water wells, but also past and future medical costs, loss of earnings, and household expenses, among others.

## CLASS ACTION ALLEGATIONS

117. Plaintiffs and Class Members have all suffered injury in fact as a result of the presence of PFAS in the drinking water supplied to the Plaintiffs' properties as a result of Defendants' unlawful conduct.

118. Plaintiffs bring this lawsuit on behalf of themselves and all other individuals that are similarly situated.

119. The proposed Class Definition is "all owners of real property where PFOA or PFOS has been detected in a drinking water well as a result of AFFF use at Piedmont Triad International Airport."

120. Excluded from the putative class are Defendants and their officers, directors, and employees. Plaintiffs reserve the right to modify or amend the Class Definition before the Court determines whether certification is appropriate.

121. Ascertainability. The members of the Class are readily ascertainable by reference to public property records and Plaintiffs' personal and employment records.

122. Numerosity. The members of the Class are so numerous that their individual joinder is impracticable. Upon information and belief, there are over 100 putative Class Members.

123. Existence and predominance of Common Questions of Law and Fact. Common questions of law and fact that exist as to all members of the Class predominate over any questions affecting only individual class members. All members of the Class have been subject to the same conduct and suffer injuries as a result. Questions of law or fact which are common to the Class, as set forth in this Complaint, predominate over questions affecting individual members because class members are similarly situated victims of Defendants' common course of conduct. Defendants' conduct similarly harmed all Class Members because Defendants designed, manufactured, promoted, and sold AFFF and other Fluorosurfactant Products used in the vicinity of Plaintiffs' properties. In addition, Defendants have no defenses specific to individual Class Members, and Defendants' defenses, if any, apply equally to all Class Members. The common legal and factual questions include, but are not limited to, the following:

a. whether AFFF, when used as intended, is unreasonably dangerous;

b. whether AFFF, when used as intended, contaminate nearby properties and private wells;

c.    whether Defendants could have reasonably foreseen that AFFF products, when used as intended, would contaminate nearby properties and private wells;

d.    whether Defendants could have reasonably foreseen that AFFF, when used as intended, would cause injurious exposure to individuals who own, reside, work, and visit those properties and/or consume or use water supplied by private wells on those properties;

e.    whether the presence of AFFF on properties and in private wells constitutes a public nuisance;

f.    whether Defendants owed Plaintiffs and Class Members a duty to ensure that their AFFF products, when used as intended, did not contaminate nearby properties and private wells;

g.    whether Defendants owed Plaintiffs and Class Members a duty to warn about hazards associated with AFFF when used as intended;

h.    whether Defendants owed Plaintiffs and Class Members a duty to warn about AFFF's propensity to expose individuals to PFAS through contamination of properties and private wells;

i.    whether Defendants breached their duties;

j.    whether Defendants' actions directly and proximately caused Plaintiffs' and Class Members' injuries and damages;

k.    whether Defendants' conduct supports an award of punitive damages.

124.    Typicality. Plaintiffs' claims are typical of the claims of the members of the Class in that Plaintiffs are members of the Class that Plaintiffs seek to represent. Plaintiffs own properties contaminated with PFOA and PFOS and have been exposed to both PFOA and PFOS.

125.    Adequacy of Representation. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in litigating environmental torts, products liability, personal injury, and class actions. Plaintiffs have no adverse or antagonistic interests to those in the Class and will fairly and adequately protect the interests of the Class.

Plaintiffs' attorneys are aware of no interests adverse or antagonistic to those of the Plaintiffs and proposed Class.

126.    Superiority. A class action is superior to any other theoretically available method for the fair and efficient adjudication of this controversy. Significant economies of time, effort, and expense will inure to the benefit of the Court and the parties in litigation of essentially identical issues on a class-wide rather than a repetitive individual basis. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system and the issues raised by this action. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendants. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. No unusual difficulties are likely to be encountered in the management of this class action, and concentrating the litigation in a single forum is particularly convenient to the parties.

## FIRST CAUSE OF ACTION PUBLIC NUISANCE

127.    Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

128.    Defendants manufactured, distributed, marketed, and promoted PFAS-containing products including AFFF in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the free use of Plaintiffs' Properties.

129.    The presence of PFAS interferes with the use of Plaintiffs' Properties as a source of drinking water supply.

130.    The presence of PFAS causes significant costs, inconvenience, and annoyance to Plaintiffs, who rely upon private drinking water wells for potable drinking water.

131. The condition affects a substantial number of people in the community who rely upon private drinking water wells for residential, commercial, and recreational purposes and interferes with the rights of the public at large to clean and safe drinking water resources and environment.

132. An ordinary person would be reasonably annoyed or disturbed by the presence in drinking water of toxic PFAS that endanger human health and degrade water quality.

133. The seriousness of the environmental and human health risk far outweighs any social utility of Defendants' conduct in manufacturing PFAS and PFAS-containing products and concealing the dangers posed to human health and the environment.

134. Plaintiffs have suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, and Plaintiffs have incurred or will incur substantial costs to remove PFAS from their properties and water wells.

135. Plaintiffs did not consent to the conduct that resulted in the contamination of Plaintiffs' Properties.

136. Defendants' conduct was a substantial factor in causing the harm to Plaintiffs.

137. Defendants knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PFAS-containing products was causing the type of contamination now found in and around Plaintiffs' Properties. Defendants knew that PFAS would contaminate water supplies and are associated with serious illnesses and cancers in humans. Defendants thus knew, or should have known, that PFAS contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of private water supply wells.

138. As a direct and proximate result of Defendants' creation of a public nuisance, Plaintiffs have suffered, and continue to suffer, monetary damages to be proven at trial.

139. Defendants' conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they manufactured,

promoted, sold, and supplied PFAS-containing products including AFFF, knowing that these products would release PFAS that are toxic, cannot be contained, and last for centuries.

## SECOND CAUSE OF ACTION PRIVATE NUISANCE

140.    Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

141.    Plaintiffs' Properties have been contaminated by PFOA and/or PFOS as a direct and proximate result of the acts and omissions of Defendants as set forth above.

142.    PFAS contamination is a substantial and unreasonable interference with the use of Plaintiffs' Properties and, specifically, with the use of private wells to provide potable drinking water.  The chemicals contaminate Plaintiffs' Properties and threaten the health of everyone in the community who relies upon the contaminated wells for potable water.

143.    PFAS contamination caused by Defendants' conduct has damaged Plaintiffs' Properties and interfered with the ordinary safety, use, benefit, and enjoyment of Plaintiffs' Properties.

## THIRD CAUSE OF ACTION
## PRODUCTS LIABILITY- INADEQUATE DESIGN (G.S. § 99B-6)

144.    Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

145.    Plaintiffs were  harmed by PFAS-containing products including AFFF which were designed, manufactured, sold, and distributed by Defendants, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

146.    The design of Defendants' PFAS-containing products were defective because, at the time of the products' manufacture, Defendant acted unreasonably in designing or formulating the product, and this conduct was a proximate cause of the Plaintiffs' harm.

147. In addition, at the time the products left Defendants' control, each Defendant unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation that could then have been reasonably adopted and that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

148. Moreover, at the time the product left Defendants' control, the design or formulation of the product was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design.

149. The design of Defendants' PFAS-containing products caused harm to Plaintiffs.

150. The design of Defendants' PFAS-containing products was a substantial factor in causing harm to Plaintiffs.

151. The gravity of the huge environmental harm resulting from the use of Defendants' PFAS-containing products was, is, and will be enormous because PFAS contamination is widespread, persistent, and toxic.

152. The likelihood that this harm would occur was, is, and will be very high because Defendants knew and/or should have known that Defendants' PFAS-containing products were toxic, could not be contained, and do not readily degrade in the environment.

153. Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

154. Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## FOURTH CAUSE OF ACTION
## PRODUCTS LIABILITY- FAILURE TO WARN (G.S. § 99B-5)

155.    Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

156.    Plaintiffs were  harmed by PFOA, PFOS, and other PFAS-containing products that Defendants designed, manufactured, sold, and distributed.

157.    Defendants' PFAS-containing products were designed, manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

158.    Defendants' PFAS-containing products were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

159.    The potential environmental hazard and toxicity risks of Defendants' PFAS-containing products were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light of Defendants' superior knowledge about their products at the time of design, manufacture, sale, and distribution.

160.    The potential environmental hazard and toxicity risks presented an unreasonably dangerous condition when Defendants' PFAS-containing products were and are used or misused in an intended or reasonably foreseeable way, and Defendants knew that this condition posed a substantial risk of harm to reasonably foreseeable users and bystanders including property owners like Plaintiffs.

161.    The risks of PFAS are not a matter of common knowledge. Ordinary consumers and third-parties would not have recognized the potential risks.

162.    Defendants failed to adequately warn or instruct of the potential risks.

163. Plaintiffs were, are, and will continue to be, harmed by Defendants' PFAS-continuing products.

164. The lack of sufficient instructions or warnings was a substantial factor in causing Plaintiffs' harm.

165. Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

166. Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## FIFTH CAUSE OF ACTION

### NEGLIGENCE

167. Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

168. Defendants designed, manufactured, sold, and distributed PFAS-containing products.

169. Defendants' PFAS-containing products were designed, manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

170. Defendants' PFAS-containing products were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

171. Defendants were negligent by not using reasonable care to warn or instruct about the risks associated with PFAS-containing products.

172. Defendants knew or reasonably should have known that their PFAS-containing products were dangerous or likely to be dangerous when used or misused in a reasonably foreseeable manner.

173. Defendants knew or reasonably should have known that users and third parties would not realize the danger.

174. At all times, it was reasonably foreseeable to Defendants that when used as intended, PFAS-containing products would cause contamination of soil and water and would present risks to human and environmental health.

175. Defendants failed to adequately warn of the danger or instruct on the safe use of PFAS-containing products.

176. A reasonable chemical manufacturer, seller, distributor, under the same or similar circumstances would have warned of the danger or instructed on the safe use of PFAS-containing products.

177. Plaintiffs were, are, and will continue to be harmed by Defendants' PFAS-containing products.

178. Defendants' failure to warn or instruct proximately caused Plaintiffs' harm.

## SIXTH CAUSE OF ACTION
## GROSS NEGLIGENCE

179. Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

180. Defendants designed, manufactured, sold, and distributed PFAS-containing products.

181. Defendants' PFAS-containing products were designed, manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

182.    Defendants' PFAS-containing products were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

183.    Defendants were negligent by not using reasonable care to warn or instruct about the risks associated with PFAS-containing products.

184.    Defendants knew that their PFAS-containing products were dangerous or likely to be dangerous when used or misused in a reasonably foreseeable manner.

185.    Defendants knew or reasonably should have known that users and third parties would not realize the danger.

186.    Defendants acted with a conscious disregard of the safety of others.

187.    At all times, Defendants purposely acted with knowledge that its actions would breach its duty to not cause harm to others. Defendants knew that when used as intended, PFAS-containing products would cause contamination of soil and water and would present risks to human and environmental health.

188.    A reasonable chemical manufacturer, seller, distributor, under the same or similar circumstances would have warned of the danger or instructed on the safe use of PFAS-containing products.

189.    Plaintiffs were, are, and will continue to be harmed by Defendants' PFAS-containing products.

190.    Defendants' failure to warn or instruct proximately caused Plaintiffs' harm

**SEVENTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (G.S. § 25-2-314)**

191. Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

192. At all relevant times, Defendants were in the business of designing, manufacturing, selling, and distributing PFAS-containing products such as those at issue here.

193. Defendants warranted that their PFAS-containing products are merchantable.

194. Defendants designed, manufactured, sold, and distributed PFAS-containing products without adequate warning of toxicity, potential human health risks, and environmental hazards.

195. Defendants' PFAS-containing products were defective or otherwise unmerchantable when they left Defendants' control.

196. When used for the ordinary purposes for which such PFAS-containing products were used and intended, PFAS-containing products were defective or otherwise unmerchantable because PFAS compounds escaped from those products, causing contamination of soil and water and presenting risks to human and environmental health.

197. Defendants breached their implied warranty of merchantability because the goods are not fit for the ordinary purposes for which such goods are used.

198. Defendants breached their implied warranty of merchantability because the PFAS-containing products were not packaged and labeled with the appropriate warnings about contamination and resulting health risks or with instructions that would have prevented the contamination.

199. Defendants became aware of the human health risks and environmental dangers presented by PFAS-containing products by no later than the year 2000.

200. Plaintiffs were, are, and will continue to be harmed by Defendants' PFAS-containing products.

201.     Defendants' breach of the implied warranty of merchantability proximately caused Plaintiffs' harm.

202.     Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

203.     Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## EIGHTH CAUSE OF ACTION
### TRESPASS

204.     Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

205.     Plaintiffs own real property including private wells. Each Plaintiff has significant property interests in its real property as well as in the water it appropriates and uses.

206.     Defendants intentionally, recklessly, and negligently caused PFAS to enter into the real properties and drinking water wells owned by Plaintiffs.

207.     Plaintiffs did not give permission for the entry.

208.     Plaintiffs were, are, and will continue to be harmed by the entry of PFAS onto their Properties.

209.     Defendants' conduct proximately caused Plaintiffs' harm.

210.     Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

211.    Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## NINTH CAUSE OF ACTION
## CIVIL CONSPIRACY

212.    Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs

213.    At all times relevant to this lawsuit, Defendants actually knew of the hazards that PFOA and PFOS posed to the environment, including to Plaintiffs' Properties.

214.    Beginning in the 1960s and continuing through the date of the filing of this Complaint, Defendants agreed to engage in unlawful and wrongful acts that caused damage to the Plaintiffs. Each Defendant performed at least one overt act in furtherance of this conspiracy. Specifically, Defendants colluded for the avowed purpose of providing information about AFFF products containing PFOA and/or PFOS to the public and the government, with the true, unlawful purpose of:

a.      intentionally misrepresenting to the EPA and the public that AFFF containing PFOA and/or PFOS was safe and did not pose a risk to human health and the environment;

b.      concealing the dangers of AFFF containing PFOA and/or PFOS, including the products' characteristics and their propensity to contaminate soil and groundwater, from the government and public by, among other means, repeatedly misrepresenting how products containing PFOA and/or PFOS were being disposed of;

c.      concealing the dangers of PFOA and/or PFOS from consumers and the public; and

d.      using their considerable resources to fight legislation concerning PFOA and PFOS.

215. As a direct and proximate result of Defendants' conspiracy, Defendants' AFFF products at all times relevant to this litigation have:

e.     posed and continue to pose a threat to Plaintiffs' Properties;

f.     contaminated and will continue to contaminate Plaintiffs' Properties;

g.     contaminated and will continue to contaminate the soil, surface and groundwater on and within the vicinity of Plaintiffs' Properties;

h.     required and will continue to require testing and monitoring of Plaintiffs' Properties for PFOA and PFOS contamination;

i.     required or will require remediation of PFOA and PFOS contamination or, where remediation is impracticable or insufficient for Plaintiffs, removal and disposal of the contamination;

j.     diminished confidence in, and the use and enjoyment of, Plaintiffs' Properties;

k.     diminished the value of Plaintiffs' Properties due to actual, impending, and/or threatened PFOA and PFOS contamination; and

l.     caused and/or will cause Plaintiffs to sustain substantially increased damages and expenses resulting from the loss of the safety, use, benefit and/or enjoyment of its property.

## TENTH CAUSE OF ACTION
## FRAUDULENT TRANSFER (DUPONT AND CHEMOURS)

216. Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

217. Plaintiffs seek equitable and other relief pursuant to the Uniform Fraudulent Transfer Act against DuPont.

218. Upon information and belief, in February 2014, DuPont formed The Chemours Company as a wholly-owned subsidiary, and used it to spin off DuPont's "Performance Chemicals" business line in July 2015.

219. Upon information and belief, at the time of the spinoff, DuPont's Performance Chemicals division contained the AFFF and/or PFAS business segments. In addition to the transfer of the Performance Chemicals division, Chemours accepted broad assumption of

220. liabilities for DuPont's historical use, manufacture, and discharge of PFAS.

221. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture and sale of PFAS compounds and products that contain PFAS compounds.

222. Upon information and belief, as a result of the transfer of assets and liabilities described in this Complaint, DuPont limited the availability of assets to cover judgements for all of the liability for damages and injuries from the manufacture and sale of PFAS compounds and products that contain PFAS compounds.

223. Upon information and belief, DuPont has (a) acted with intent to hinder, delay and defraud parties, or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) was engaged or was about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

224. Upon information and belief, DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties, such as the Plaintiffs, that have been damaged as a result of DuPont's actions as described in this Complaint.

225. Upon information and belief, DuPont and Chemours acted without receiving a reasonably equivalent value in exchange for the transfer of obligations, and DuPont believed, or reasonably should have believed, that it would incur debts beyond Chemours' ability to pay as they became due.

226. Plaintiffs seek to avoid the transfer of DuPont's liabilities for the claims brought in this Complaint and to hold DuPont jointly and severally liable for any damages or other remedies that may be awarded by this Court or a jury under this Complaint.

227. Plaintiffs further reserve such other rights and remedies that may be available to it as may be necessary to fully compensate Plaintiffs for the damages and injuries alleged in this Complaint.

## PUNITIVE DAMAGES

228. Under the applicable laws of the State of North Carolina, Plaintiffs seek Punitive damages due to the wanton and willful acts and/or omissions of Defendants as set forth and alleged throughout this Complaint.

## JURY DEMAND

229. Plaintiffs demand a jury trial.

## PRAYER FOR RELIEF

230. Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court grant Plaintiff and each Class Member the following relief against Defendants, jointly and severally, as follows:

a.   Certify the Class as requested;

b.   Appoint Plaintiffs to serve as the Class Representatives;

c.   Appoint Scott Summy and Carla Burke Pickrel as Lead Class Counsel;

d.  Enter judgment for Plaintiffs and against Defendants for compensatory and punitive damages, all costs and expenses of suit, and pre- and post-judgment interest;

e.  Order such injunctive and equitable relief as necessary to abate the nuisance caused by Defendants and to prevent continuing injury and damages to Plaintiffs;

f.  Order any further relief as the Court deems just and proper.

Respectfully submitted this the _18_ day of _May_____, 2023.

**HUTCHENS LAW FIRM LLP**

J. Scott Flowers
N.C. State Bar No.: 31525
Post Office Box 2505
Fayetteville, NC 28302
Telephone: (910) 864-6888
Facsimile: (910) 867-8732

**BARON & BUDD, P.C.**

Scott Summy
N.C. State Bar No.: 27171
Carla Burke Pickrel (TX Bar 24012490)
(*Pro Hac Vice* pending)
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219-4281
Telephone:  (214) 521-3605

**COSSICH, SUMICH, PARSIOLA & TAYLOR, LLC**

Philip F. Cossich, Jr. (LA Bar 1788)
(*Pro Hac Vice* pending)
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
(504) 394-9000

*Attorneys for Plaintiffs*